# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>UNITED STATES OF AMERICA and MICHAEL JEFFERSON,<br><br>　　　　　　　　　　Defendants. | Civil Action No.:<br><br>ECF Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Jane Doe,[1] by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP, for her Complaint against Defendants as above captioned, brings claims and alleges as follows upon information and belief:

## INTRODUCTION

1.　　Defendant Michael Jefferson (hereinafter "Officer Jefferson") was a former correctional officer at Federal Detention Center – Philadelphia (hereinafter "FDC Philadelphia") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape Plaintiff Jane Doe (hereinafter "Plaintiff" or "Ms. Doe"), who was incarcerated at FDC Philadelphia in the custody of the United States Bureau of Prisons (hereinafter "BOP") at the time. Instead of protecting Ms. Doe, who was under his care and control, Officer Jefferson was allowed and emboldened by BOP to prey upon her.

---

[1] Plaintiff seeks to proceed anonymously in this action given the highly sensitive nature of the allegations concerning a violent rape that she suffered, and her reasonable fear of severe harm she would suffer if her identity were to be publicly released.

2.     On or around July 6, 2024, then 35-year-old Ms. Doe, was brutally raped by Officer Jefferson in her jail cell, known as the "dry cell" in the Special Housing Unit (hereinafter "SHU") of FDC Philadelphia. The dry cell was meant to be a special cell for increased supervision, monitoring, and observation, as Ms. Doe had been placed on a suicide watch after her arrival at FDC Philadelphia three days earlier, due to her prior attempt to take her own life during her transfer to FDC Philadelphia. Throughout her time at FDC Philadelphia, Ms. Doe was on suicide watch and/or psychological observation and should have received constant visual monitoring.

3.     Knowing Ms. Doe's vulnerable state and condition, Defendant United States of America, through its agents, servants, contractors, and employees, allowed Officer Jefferson to unlock Ms. Doe's cell during nighttime patrol, enter the cell at his leisure, and take her by force, in what was meant to be a high-security, maximally protective housing unit. This egregious sexual assault occurred only due to negligence, gross negligence, carelessness, and otherwise wrongful acts and omissions of Defendant United States of America and its agents, servants, contractors, and employees, including but not limited to other BOP officers at FDC Philadelphia who were also monitoring or patrolling the SHU during the time of the rape. Other BOP officers who knew or should have known about Officer Jefferson's sexual abuse permitted, condoned, or acquiesced to his misconduct.

4.     The SHU is a separate section of FDC Philadelphia, distinct from general population and on a separate floor. Other than the male and female SHU units, there is an enclosed section of the SHU with approximately three dry cells and an officer's station. Incarcerated people who require constant visual observation by BOP staff, like Ms. Doe, are placed in one of these dry cells. As such, there are multiple correctional officers assigned to monitor the dry cells at all times, rotating between three shifts (6:00 AM – 2:00 PM, 2:00 PM – 10:00 PM, and 10:00 PM – 6:00

AM). In addition to one officer being physically present at the officer's station, at least one other officer is assigned to patrol and monitor the dry cells that house vulnerable individuals.

5. Contrary to the BOP's representation that the dry cell was for her own protection given her recent suicide attempt, Ms. Doe found the condition of the dry cell deplorable and inhumane. Upon her arrival on or around July 3, 2024, an officer forced Ms. Doe to strip naked and took all her clothes. From on or about July 3, 2024, through on or about July 5, 2024, she was forced to remain naked in her cell with only a blanket or a smock to cover herself, despite there being male correctional officers, including the rapist, Officer Jefferson, monitoring her during this time period. She would see male officers, as well as an incarcerated man who was assigned for cleaning duties, walk around the dry cell area and look at her body through the glass window of her cell. After being deprived of clothing for three days, finally on or about July 5, 2024, Ms. Doe was given a jumper, a T-shirt, and underwear.

6. Additionally, there was no running water or toilet in Ms. Doe's cell, and the correctional officers instead made her urinate and defecate using a jug and a bed pan, thereby forcing Ms. Doe to expose herself out of necessity while she was fully visible to male correctional officers, including Officer Jefferson, due to the design of her cell.

7. Defendant United States of America, through its agents, servants, contractors, and employees, knew or should have known that Ms. Doe was in a substantial and foreseeable risk of being sexually assaulted, raped, and abused given that she was a vulnerable person being held without clothes for a prolonged period in a location isolated from other incarcerated women, while under the complete control of male correctional officers. BOP officers exercised complete dominion and power over Ms. Doe, with the key to her cell and control over her safety, health, welfare, and contact with the outside world.

8.      On the night of July 5, 2024, Ms. Doe observed Officer Jefferson and two unknown white male correctional officers talking in the dry cell area by the officer's station. Shortly after this, Ms. Doe went to sleep until she was violently awoken by Officer Jefferson who had entered her cell, mounted her body, pinned down her arms to prevent her from moving, and threatened her to remain quiet. Ms. Doe pleaded with Officer Jefferson to not rape her. He instead snapped back, "Shut up." He then proceeded to vaginally rape Ms. Doe and also attempted to rape her anally. He did not wear a condom and ejaculated into her and onto her shirt. Locked in a cell under Officer Jefferson's custodial, supervisory, and disciplinary authority, Ms. Doe had no escape from his predatory conduct.

9.      Defendant United States of America, through its agents, servants, contractors, and employees, failed to provide proper monitoring and supervision to ensure that Ms. Doe was not being placed in the way of foreseeable harm, which ultimately resulted in her being raped by Officer Jefferson. Throughout this violent rape, and for the next few hours while Ms. Doe fearfully waited in her cell for her rapist to end his shift so that she could report the rape, no BOP officer checked, monitored, or observed Ms. Doe's condition. During this time, Ms. Doe does not recall BOP officers doing the rounds every 30 minutes as was required, which is particularly egregious given that Ms. Doe required constant visual observation based on her mental status.

10.     Upon information and belief, on the night of July 5, 2024, into the morning of July 6, 2024, there were at least two correctional officers solely assigned to watch Ms. Doe, as she was the only person who was placed in the dry cells at the time. One of these officers was the rapist, Officer Jefferson, and another was a white male correctional officer (hereinafter referred to as "Officer John Doe #1" or "Officer Doe #1"). This officer was at the officer's station during the

10:00 PM – 6:00 AM shift, and therefore, knew or should have known that Officer Jefferson was entering Ms. Doe's cell in the middle of the night for no reason.

11. Officer John Doe #1 should have been monitoring Ms. Doe during the rape. If Officer Doe #1 had been properly complying with his required job duties and monitoring Ms. Doe, she would have not been raped by Officer Jefferson.

12. Given that Ms. Doe was the only person housed in the dry cells at the time, there is no reason why Officer Doe #1 failed to properly monitor Ms. Doe and prevent the rape. In fact, it is more likely than not that he either saw the rape or turned a blind eye to it.

13. Officer Doe #1 either was monitoring Ms. Doe and failed to intervene to stop the rape or was failing to watch her all together, both of which are in clear violation of his non-discretionary duty to monitor, supervise, and protect Ms. Doe.

14. Therefore, through either carelessness, inattentiveness, laziness, or actual affirmative approval, Officer Doe #1 as Defendant United States of America's agent, servant, or employee permitted, allowed, approved, and condoned Officer Jefferson to violently rape and sexually assault Ms. Doe.

15. Upon information and belief, Correctional Officer Doe #1 was not the only BOP officer who knew or should have known about alarming warning signs and/or sex abuse allegations against Officer Jefferson. It was known among officers and incarcerated people, that Officer Jefferson likes to have women in the SHU cells strip naked and dance for him so that he can see. BOP personnel failed to intervene to prevent Officer Jefferson's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sexual abuse on prisoners.

16.     Prior to and in the morning of July 6, 2024, BOP employees knew, based on their training, experience and/or BOP policies and procedures, that there is a substantial risk of leaving an officer alone with an incarcerated person in an isolated area and how this can lead to improper or abusive conduct, including but not limited to sexual abuse, sexual assault, and rape. There are policies and customs within the BOP that prevent officers from being alone with incarcerated people. Nonetheless, Officer Jefferson was allowed to enter Ms. Doe's locked cell to do with her as he pleased, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

17.     Defendant United States of America, through its agents, servants, contractors, and employees, was negligent in allowing Officer Jefferson to be alone with Ms. Doe for a prolonged period, allowing, encouraging, and/or emboldening him to rape her. Such conduct was in direct and apparent violation of BOP Program Statement 5324.08, which states that when an incarcerated person is on psychological observation, "the observer and suicidal inmate will not be in the same room/cell and will have a locked door between them."

18.     BOP officers who observed Ms. Doe's cell, either directly, or through the security cameras from the control room, knew that Officer Jefferson was breaking the BOP protocol by entering Ms. Doe's cell; and that there was no legitimate reason for him to do so, especially while Ms. Doe was asleep. These officers' failure to intervene permitted, condoned, and facilitated Officer Jefferson's rape of Ms. Doe.

19.     Following the rape, Ms. Doe laid in her cell petrified with fear until around 6:00 AM, when she heard Officer John Doe #1 speaking with a female correctional officer who had arrived for her morning shift. Inferring that her rapist was no longer present, Ms. Doe worked up the courage to immediately report the rape to prison officials, which started a criminal investigation

into Officer Jefferson's conduct. Ms. Doe did not even know her rapist's name at the time, but did her best to cooperate with the investigators and underwent a rape kit at an outside facility.

20. On April 29, 2025, Officer Jefferson was indicted on one count of aggravated sexual abuse, one count of sexual abuse, one count of sexual abuse of a ward, and one count of deprivation of rights under color of law arising from his rape of Ms. Doe. *See* 2:25-cr-00182 (JDW) (E.D. Pa). The trial for this criminal action is set to commence in January 2026. The United States of America is expected to prove beyond a reasonable doubt that Officer Jefferson used FDC Philadelphia as his playground, causing Ms. Doe to engage in an unwanted sexual act by using force, resulting in bodily injuries to her. In addition, while acting under color of law, Officer Jefferson deprived Ms. Doe of her constitutionally protected right not to be subjected to cruel and unusual punishment.

21. Officer Jefferson was "suspended" from his BOP position as of May 1, 2025, and upon information and belief, was eventually terminated by Defendant United States of America.

22. In sum, Ms. Doe suffered a brutal rape while in BOP custody because of the egregious disregard for, and carelessness towards, Ms. Doe's safety and well-being, by BOP officers including but not limited to Officer Jefferson, Correctional Officer John Doe #1, and their supervisors and colleagues.

23. Plaintiff brings this suit pursuant to the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient and careless supervision, monitoring, and custodial care provided to Ms. Doe by various BOP personnel including Officer Jefferson, Officer Doe #1, and their supervisors and colleagues, who were acting within the scope of their employment with the BOP. Plaintiff also brings related state law claims against Officer Jefferson individually.

24.     Plaintiff seeks redress for Defendants' negligent and otherwise unlawful conduct, which caused her to suffer permanent and catastrophic injuries, including but not limited to: major depressive disorder, complex PTSD, anxiety, suicidal thoughts, loss of quality of life, loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, past and future economic losses, past and future medical costs, past and future reputational harm, among other injuries, losses, harm, and damages.

## JURISDICTION AND VENUE

25.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) with respect to any state law claims, as they are related to and form part of the same case or controversy as claims based on the federal Constitution, laws, and/or treaties.

26.     This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of the State of Pennsylvania.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the boundaries of this District, in the County of Philadelphia.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

28.     Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America. The Claim was timely

and properly filed with the BOP on December 16, 2024, under Claim Number TRT-NER-2025-02274, within two (2) years of the accrual of the causes of action.

29.     In a letter dated May 30, 2025, the BOP unilaterally denied the Plaintiff's Claim. By filing this action within six months of that denial, on or before November 30, 2025, Plaintiff has hereby properly exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a). Moreover, this action is timely brought within the statutory time limits provided in 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

### Plaintiff

30.     At all times relevant hereto, Plaintiff Ms. Doe was an adult prisoner in the custody of BOP, incarcerated in a Federal Detention Center located at 700 Arch Street, Philadelphia, PA 19106, commonly known as FDC Philadelphia. Ms. Doe was released from BOP custody in or around June 2025 based on an Unopposed Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), based on Officer Jefferson's rape that is the basis of this lawsuit. *See* 2:18-cr-00271 (MJH) (W.D. Pa). She currently resides in the State of Pennsylvania.

31.     Given the highly sensitive and invasive nature of the allegations herein, involving violent sexual abuse committed against her, Ms. Doe seeks to proceed anonymously in this action as "Jane Doe." Ms. Doe wishes to avoid further traumatization and invasion of privacy by the disclosure of her name in this legal proceeding. Defendants suffer no prejudice as they are already aware of Ms. Doe's identity based on the criminal and administrative proceedings related to the subject incident, and moreover, Ms. Doe's identity will be disclosed to the Defendants under separate cover as part of discovery. Plaintiff will make a motion to maintain Ms. Doe's anonymity in any party's court filing in this matter.

## Defendants

32.     Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the Federal Tort Claims Act. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

33.     At all relevant times hereto, Defendant United States owned, managed, maintained, operated, supervised, inspected, and controlled the FDC Philadelphia facility and its premises.

34.     At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FDC Philadelphia, and was responsible for the hiring, retention, training, supervision, discipline, and conduct of all BOP personnel, including but not limited to Officer Jefferson.

35.     At all times relevant hereto, Defendant United States assumed the risks and non-delegable duty to maintain the FDC Philadelphia facility and its premises in a reasonably safe and suitable condition for its wards.

36.     At all times relevant hereto, Defendant United States assumed the risks and non-delegable duties arising from the ownership, maintenance, operation, control, supervision, of the FDC Philadelphia facility and its premises, and from the appointment, hiring, retention, training, supervision, promotion, discipline, and conduct of all BOP personnel.

37.     In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

38.     At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Jefferson, as well as his colleagues and supervisors, including the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, administrative or executive staff, and medical staff at FDC Philadelphia, to serve as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).

39.     At all times relevant hereto, all supervisory staff, unit staff, security staff, and medical staff at FDC Philadelphia, including the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and administrative or executive staff, were agents, servants, contractors, and/or employees of Defendant United States.

40.     At all times relevant hereto, Defendant Officer Jefferson was an adult individual residing in the State of New Jersey who was employed by the BOP and Defendant United States as a correctional officer. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Jefferson was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FDC Philadelphia, including Plaintiff Ms. Doe.

41.     At all times relevant hereto, Officer Jefferson's colleagues and supervisors, including Officer Doe #1, and other correctional officers, supervisory staff, unit staff, security staff, and medical staff at FDC Philadelphia, were also employees of BOP and Defendant United States. It was in their capacity as agents, servants, contractors, and employees of Defendant United States, and within the course and scope of their employment as such, that these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control,

direction, protection, safety, and well-being of people confined at FDC Philadelphia, including Plaintiff Ms. Doe.

42.    At all times relevant hereto, in their capacity as agents, servants, contractors, and employees of Defendant United States, and within the course and scope of their employment as such, Officer Jefferson and other correctional officers, supervisory staff, unit staff, security staff, and medical staff at FDC Philadelphia had a non-delegable duty to ensure the safety and welfare of all incarcerated people in the institution and to ensure the orderly running of the institution.

43.    At all times relevant hereto, Officer Jefferson was an agent, representative, or employee of Defendant United States, and was performing and engaging in conduct incidental to the performance of his function as such. At all times relevant hereto, Officer Jefferson acted within the course and scope of said agency, representation, or employment and was within the scope of his authority, whether actual or apparent. At all times relevant hereto, Officer Jefferson was the authorized agent, partner, servant, or contractor of Defendant United States, and the acts and omissions herein alleged were done by Officer Jefferson acting through such capacity, with the power and authority vested in him by his position, under the color of federal law, with the permission, ratification, approval, and consent of Defendant United States.

44.    At all times relevant hereto, Officer Jefferson's colleagues and supervisors, including Officer John Doe #1, and other correctional officers, supervisory staff, unit staff, security staff, and medical staff at FDC Philadelphia, were also agents, representatives, or employees of Defendant United States, and were performing and engaging in conduct incidental to the performance of their functions as such. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the

authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, with the power and authority vested in them by their position, under the color of federal law, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

45.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues and claims in this action that are so triable.

## STATEMENT OF FACTS

**INDICATIONS AND WARNING SIGNS OF OFFICER JEFFERSON's SEXUAL ABUSE**

46.     Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, the U.S. Department of Justice promulgated certain regulations, which remain binding on all BOP facilities, including FDC Philadelphia. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

47.     In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

        a.     Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

b.      Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature. The statement goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

c.      Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

d.      Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

48.      BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

49.      Officer Jefferson's rape of Ms. Doe, while brutal, was not an isolated occurrence that took place in a vacuum. It is highly unlikely for an officer to leap from conduct that is concordant with BOP's "zero-tolerance policy" to vaginal rape with physical force in an incarcerated woman's cell that was under constant surveillance. It is highly likely that Officer Jefferson had a history of prior conduct, routines, and *modus operandi* that involved flagrant

violations of FDC Philadelphia's security and operating protocols, which were and should have been obvious to other BOP personnel.

50.     Upon information and belief, Officer Jefferson had a reputation among SHU prisoners for being a "pervert" who did inappropriate things to them, like making certain women strip naked and show their bodies to him from inside their prison cells. This reputation was known to other BOP personnel, including unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and administrative or executive staff at FDC Philadelphia.

51.     Prior to and at the time of Ms. Doe's rape, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and administrative or executive staff, observed Officer Jefferson placing himself in posts where he would be alone and unsupervised with prisoners in or around their prison cells. Upon information and belief, he would frequently work in the SHU and ask women housed in the SHU for sexual favors.

52.      Prior to and at the time of Ms. Doe's rape, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and administrative or executive staff, observed Officer Jefferson substantial amounts of time alone with incarcerated women in various isolated areas within FDC Philadelphia, which were typically "blind spots" that were not captured by security cameras. Other BOP officers knew of, and disregarded, Officer Jefferson's abnormal behavior of repeatedly isolating himself with certain prisoners.

53.     Officer Jefferson, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as the dry cell area. Officer Jefferson took advantage of these known blind spots to brutally abuse Ms. Doe.

54.    Instead of accompanying and monitoring Officer Jefferson as they should have, other SHU officers at FDC Philadelphia allowed Officer Jefferson to isolate himself with incarcerated women, including Ms. Doe at the time of her rape.

55.    BOP officers, including Officer John Doe #1, knew or should have known the indications, signs, and concerns of Officer Jefferson's sexually abusive conduct. Nonetheless, they turned a blind eye and allowed Officer Jefferson unfettered access to Ms. Doe.

56.    Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

57.    Defendant United States and its agents, servants, contractors, and employees had opportunities to follow the above-mentioned mandates and stop Officer Jefferson's sexual misconduct upon observing his abnormal actions. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. Nevertheless, BOP

personnel took no action to investigate or stop Officer Jefferson's suspicious behavior, which culminated in his rape and attempted sodomy of Ms. Doe.

58.     Upon information and belief, Defendant United States and its agents, servants, contractors, and employees failed to report, investigate, discipline, supervise, monitor, question, or stop Officer Jefferson despite prior indications of his sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

59.     Despite prior indications of his sexual misconduct, Defendant United States allowed Officer Jefferson to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit sexual assaults. Officer Jefferson was emboldened to believe that he could get away with sexual abuse while flagrantly violating BOP's policies. Victims of sexual abuse in custody have legitimate concerns that they would suffer retaliation or other substantial harm if they were to report an officer's assaults. To further fuel this fear, Officer Jefferson verbally threatened Ms. Doe to ensure her silence.

60.     Leading up to and on the day of Ms. Doe's rape, BOP personnel at FDC Philadelphia violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

61.     BOP personnel's reckless disregard of the safety and welfare of incarcerated women including Plaintiff Ms. Doe is highlighted by the fact that multiple correctional officers were reportedly sexually assaulting women incarcerated at FDC Philadelphia during similar

timeframe. Officer Jefferson fed into, and was also encouraged and enabled by, this toxic culture at FDC Philadelphia.

62.    Upon information and belief, at least five other women reported to the BOP and/or other external investigative agencies that they were sexually assaulted by correctional officers at FDC Philadelphia between late 2023 and early 2024. While victims are not privy to much, if any, information regarding the status of the investigation, it is notable that there were multiple complaints of staff-on-inmate sexual assault that the BOP personnel at FDC Philadelphia were aware of by the time of Ms. Doe's rape; yet, no preventative measures were in place to prevent Officer Jefferson from unlocking and entering Ms. Doe's cell that was purportedly under "constant observation," lying on top of her while she was asleep, vaginally raping her, attempting to anally rape her, ejaculating, and again unlocking and leaving the cell with complete freedom.

63.    Upon information and belief, Ms. Doe's rape is the only incident that has resulted in criminal charge for sexual abuse of FDC Philadelphia officers to date. However, the Department of Justice (hereinafter "DOJ")'s refusal to criminally prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison, Federal Correctional Coleman in Florida, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[2]

64.    Sexual abuse of incarcerated people is an issue endemic to BOP, contrary to its purported zero-tolerance policy. In 2022, the U.S. Senate Permanent Subcommittee on

---

[2] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[3]

65. Despite this established history of sexual abuse in BOP custody, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. FDC Philadelphia's PREA audit report that was released on or around May 17, 2024, claimed that FDC Philadelphia did not have any allegation of staff sexual abuse in the preceding 12 months, but there was at least one incarcerated woman who made such an allegation to BOP staff that is not accurately reflected in this audit. The audit report also claims that there was no blind spot from security cameras which, if true, raises the question of why Officer Jefferson was allowed to enter Ms. Doe's cell and rape her in the plain view of the cameras, and, if untrue, casts doubt on the validity of the audit.

66. Based on the history of sexual abuse in BOP custody, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas. Federal Prison Camera Reform Act was signed into law in December 2022 after the publication of the PSI Report, which mandated BOP facilities to install additional security cameras to eliminate the blind spots. Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Jefferson from engaging in sexual abuse, including by eliminating the blind spots in the dry cell area housing vulnerable

---

[3] *Id.* at 4.

women. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

67.     Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FDC Philadelphia before, during, and after Officer Jefferson's rape of the Plaintiff.

**OFFICER JEFFERSON's SEXUAL ABUSE OF PLAINTIFF**

68.     Emboldened by other BOP personnel's failure to stop him, Officer Jefferson used the tools available to him through the BOP, such as keys to Ms. Doe's cell and blind spots from security cameras, to violate and terrorize Plaintiff Ms. Doe.

69.     Ms. Doe came into BOP custody in or around 2021 at 31 years of age with a history of major depressive disorder in partial remission and a history of bipolar disorder that was managed with medication. Ms. Doe remained incarcerated in BOP custody until around June 2025, when her sentence reduction motion was granted without opposition based on Officer Jefferson's rape at issue in this case.

70.     At intake with FCI Aliceville (a federal prison in the State of Alabama) on or about April 7, 2021, it was noted that Ms. Doe had been a victim of childhood sexual assaults, the first one of which occurred when Ms. Doe was 13 years old and resulted in her suicide attempts, depression, and anxiety. Ms. Doe also had a history of being in physically and sexually abusive relationships. Given this history, Ms. Doe was immediately identified by the BOP as being at risk of sexual victimization.

71.     Ms. Doe was transferred to FCI Danbury in the State of Connecticut in January 2023 to participate in the Female Integrated Treatment program, but was eventually transferred

back to FCI Aliceville in July 2024. It was during this second transfer in July 2024 on the way to FCI Aliceville that Ms. Doe was temporarily incarcerated at FDC Philadelphia for about five days.

72.     While at FCI Danbury leading up to her transfer to FDC Philadelphia, Ms. Doe was in acute and severe mental distress, which was known to BOP personnel. On or about June 12, 2024, just over two weeks before she was transferred out of FCI Danbury, Ms. Doe attempted suicide by hanging herself with a noose made of bedsheet while she was in the SHU. Then, while being transported from FCI Danbury to FDC Philadelphia in a transit van on or about July 3, 2024, Ms. Doe made another attempt to take her own life by asphyxiating herself with the drawstring of her shorts and repeatedly banging her head against the interior of the van until she had to be restrained by BOP staff. She was not being prescribed any psychotropic medication during this period.

73.     As a result of these known suicide attempts, on July 3, 2024, the psychologist at FCI Danbury, M. Bykowski, PsyD, determined that Ms. Doe's placement on suicide watch was clinically warranted. Given Ms. Doe's transfer to FDC Philadelphia, Dr. Bykowski contacted the Operations Lieutenant as well as the Chief Psychologist at FDC Philadelphia to explain Ms. Doe's condition and to ensure that she will be placed on suicide watch.

74.     Ms. Doe was housed in FDC Philadelphia from July 3, 2024, through July 8, 2024. Throughout this time, Plaintiff was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Jefferson and other officers at FDC Philadelphia whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to

prevent prisoners such as the Plaintiff from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

75.     Upon arrival at FDC Philadelphia, Ms. Doe was kept on suicide watch for about 13 hours. However, on the morning of July 4, 2024, Ms. Doe was improperly and negligently removed from suicide watch by N. Armenti, PhD, DAPC, based on an observation that she no longer appears to be at risk for imminent self-harm. That said, Dr. Armenti diagnosed Ms. Doe with a "severe" major depressive disorder that was no longer in remission. Dr. Armenti noted in the BOP records that it would be prudent to maintain Ms. Doe under heightened "psychological observation" in the SHU, with checks to observe, monitor, and supervise her occurring "at least every 30 minutes."

76.     It was for this psychological observation that Ms. Doe was housed in cell 800 in the SHU, commonly known as a "dry cell" as the cell has no plumbing or running water. There was a set of about three dry cells adjacent to an officer's station, down the hallway from the female SHU unit. This "dry cell area" was so small that someone standing outside of Ms. Doe's cell should have been clearly visible to an officer in the officer's station. The dry cell could only be opened by correctional officers who used a physical key to unlock the door. Incarcerated people in the dry cell had to be cuffed at the waist and shackled by the ankles in order to leave the cell.

77.     Based on BOP protocols and policies, at least two officers were always required to be on duty to monitor the dry cells, such that at least one guard would be available to perform other tasks while another guard makes rounds, which must occur at least every 30 minutes. Upon information and belief, the officers were to do the rounds in rotation so that one person does not do all the rounds during a given shift.

78.     In practical terms, this meant that at least two officers were required to continuously monitor *Ms. Doe* specifically, because she was the only person who was housed in the dry cells

during the relevant time. The only incarcerated person that she saw throughout her stay in the dry cell was an incarcerated man who was assigned to be the cleaning orderly for the area.

79.     The circumstances of psychological observation and the conditions of the dry cell that Ms. Doe was subjected to were dismal. Her cell contained only a bed pan, a jug to urinate in, and a mattress covered in plastic without sheets or blankets. The cell had no windows to the outside, toilet, shower, or sink. There were traces of urine and a broken nail on the floor from a previous occupant. Ms. Doe was given no cleaning supplies. She was told to urinate and defecate using the jug and the bed pan, which she would discard through the same slot on the door where she would receive her food. She was given no recreational or outdoor time, depriving her of sunlight while keeping artificial lights on at all hours in the cell, even when she was sleeping.

80.     All of Ms. Doe's clothes and shoes had been taken from her upon her arrival on July 3, 2024, and she was given a green blanket to cover herself until she was finally given some clothes in the afternoon of July 5, 2024, after making several requests. At least part of the cell wall was in glass, which allowed officers and incarcerated people walking by to look in and see her. She recalls having to defecate squatting on the floor with the bed pan while trying to cover herself with the blanket, feeling extremely degraded.

81.     Throughout her time at FDC Philadelphia, Ms. Doe was required to be under the continuous surveillance, observation, and supervision of two or three correctional officers who were assigned to the dry cell area, including but not limited to Officer Jefferson.

82.     Ms. Doe did not know Officer Jefferson by name but knew him as a bald, tall, Black officer who was assigned to patrol the dry cell area during the overnight (10:00 PM – 6:00 AM) shift.

83.     Officer Jefferson sought out Ms. Doe's attention while she was deprived of her clothes, prior to the rape. During the night of July 4, 2024, into the morning of July 5, 2024, while Ms. Doe was sleeping, Officer Jefferson stopped by her cell, knocked on the glass, and asked, "You good?" She said, "Yes," that she was sleeping. He said he was "just checking."

84.     Upon information and belief, Officer Jefferson took an unusual interest in Ms. Doe. The other officers on duty in the dry cell area knew or should have known that Ms. Doe was in a vulnerable state as she was in an isolated area from the rest of the population, with no clothes, and with a history of recent suicide attempts, and therefore should have been on high alert for any signs of distress or abnormal activity relating to Ms. Doe.

85.     The following evening, on July 5, 2024, after finally receiving some clothes, Ms. Doe was in her cell when she heard some voices. She looked out to see two white male correctional officers (one with glasses, who was referred to as "Correctional Officer John Doe #1" above, and one without glasses) and Officer Jefferson speaking with one another by the lockers near the officer's station. Officer Jefferson wore a black hooded sweater and a backpack, having just arrived for his overnight shift. Ms. Doe recognized Officer Jefferson as the same man who had knocked on her cell window the night before.

86.     That same night, about 40 minutes after she had seen the three officers, Ms. Doe fell asleep in her cell on her stomach, with her hands on her thighs. She was wearing panties, a jumper draped around her waist, and a T-shirt on top. When Ms. Doe went to sleep, those three officers (Officer Doe #1, another white male officer, and Officer Jefferson) were assigned to the dry cell area and were monitoring her.

87.     Ms. Doe was startled awake either later that night or in the early morning of July 6, 2024, by the heavy pressure of Officer Jefferson lying on top of her backside and pinning her

down. He threatened her, "Don't say anything." She could feel the fabric of his pants against her jumper, and then heard his belt buckle and pants zipper. He grabbed and forcibly pulled down her jumper and underwear. He then pinned her down with his hands on the back of both of her arms as he lifted himself up, such that she was physically unable to move. Ms. Doe begged, "please don't," and Officer Jefferson responded, "shut up."

88.     The commotion that this interaction caused, as well as the fact that Officer Jefferson had unlocked and entered Ms. Doe's cell during nighttime for no legitimate reason, were well outside the normal routine and were or should have been noticed by other BOP officers. An officer should never enter a prisoner's cell and lock himself inside the cell with the prisoner. Yet, no BOP personnel stopped, questioned, or intervened in this highly suspicious conduct.

89.     There should have been at least one officer who remained on duty in the dry cell area. Given how small the dry cell area is, with only Ms. Doe as the housed prisoner, it strains credulity that other BOP officers did not notice Officer Jefferson's attack on Ms. Doe, visible through a glass window, with the lights on in her cell.

90.     Officers who were stationed in the SHU and/or dry cell area violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators or supervisors who received the report failed to take appropriate action to immediately stop Officer Jefferson's conduct.

91.     Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FDC Philadelphia. These officers were, and/or should

have been, suspicious of Officer Jefferson entering Ms. Doe's cell. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Jefferson's conduct. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

92.     Taking advantage of other BOP officers' failure to act, after telling Ms. Doe to "shut up," Officer Jefferson proceeded to penetrate her vagina with his penis. At one point, he also attempted to penetrate her anus with his penis, but was unsuccessful and continued to rape her vaginally. His hands were on the back of her arms, physically pinning her down, the entire time, though at one point he grabbed her shoulder instead. Ms. Doe was frozen in shock, and found herself reliving in her mind the trauma of past sexual abuse that she had suffered.

93.     As he raped her, Officer Jefferson said, "I've wanted this since I'd seen you last night." Paralyzed with fear, Ms. Doe had not even turned around or looked directly at her rapist. However, seeing that her assailant's hands were that of a Black man, Ms. Doe realized that her rapist must be the bald, tall, Black officer who had knocked on her cell window the night before, as that was the only incident that his comment could conceivably refer to, given her highly limited interactions with others while in the dry cell. Ms. Doe also knew that her rapist had to be an officer because only BOP officers could unlock her cell.

94.     After what felt like an eternity, Officer Jefferson ejaculated inside Ms. Doe's vagina without her consent. She heard his pants zip and his belt buckle. He used her shirt to wipe semen off himself, and left, locking the cell door behind him with his key. She was still too scared to turn around to face him and only caught a glimpse of his back. He was wearing a black hooded sweater, which confirmed her suspicion that her rapist was the officer who she had seen arriving for the

overnight shift shortly before she fell asleep on July 5, 2024. At some point during the rape, he had put the hood over his head.

95.     There was no sink in the cell, so once Officer Jefferson left her cell, Ms. Doe used some toilet paper and a cup of water to rinse the semen off her skin and vagina. She had to urinate, so she used the urine jug in her cell, all the while thinking about if and how to preserve the evidence. As is common for victims of sexual abuse, she felt overwhelmed, ashamed, and uncertain regarding how to process her victimization and whether to report it. In the context of sexual abuse in custody, fear of reporting is further exacerbated by the fact that the authority figures who would receive the initial reports are the rapist's colleagues and fellow officers. Indeed, Ms. Doe was initially afraid of reporting the rape as she was concerned that other staff would retaliate against her.

96.     For hours following the rape, Ms. Doe lay in her cell in fear, shock, and pain. She did not feel that she could report anything to the officers on shift, as her rapist was one of them, and the others had done nothing to stop the rape even though they could see into her cell through a window. She lay in her bed, pretending to be asleep but in fact awake. She did not see or hear any correctional officer coming by, until the shift change occurred at around 6:00 AM. This was in direct violation of the BOP policies and protocols where Ms. Doe should have been observed at least every 30 minutes and suggests, at best, the officers' laziness and dereliction of duties to monitor Ms. Doe, and at worst, the officers' awareness of Ms. Doe's rape and refusal to address it.

97.     No supervisory staff, unit staff, security staff, or control room officers came to investigate, intervene, or inquire as to the complete lack of supervision over Ms. Doe for hours leading up to 6:00 AM.

98. At around 6:00 AM, Ms. Doe saw Officer Doe #1, the same white male officer with glasses who had been speaking with Officer Jefferson during the previous evening, handing off the shift to a morning officer, who was a Black female. Upon information and belief, Officer Doe #1 had been on shift in the dry cell area the entire time from when Ms. Doe fell asleep, through her rape, up to this hand-off to a Black female officer. Therefore, Officer Doe #1 was careless, abjectly failing in his duties to keep watch over Ms. Doe, or he saw Officer Jefferson's rape and did nothing to stop it.

99. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FDC Philadelphia, including but not limited to Officer Doe #1, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to the Plaintiff's safety under Officer Jefferson's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep the Plaintiff safe from Officer Jefferson, in violation of mandatory BOP policies and federal regulations.

100. Defendant United States, through its agents, servants, contractors, and employees, breached its duty to Ms. Doe by placing her in a substantial risk of imminent injury and rape.

101. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FDC Philadelphia: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the actual violations of BOP security and operating protocols including by Officers Jefferson and Doe #1; and Officer Jefferson's propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as the Plaintiff, demonstrating a plain disregard of an excessive risk to Plaintiff's safety and welfare.

102.     Defendant United States, through its agents, servants, contractors, and employees, breached its duty to Ms. Doe by allowing Officer Jefferson to enter Ms. Doe's cell alone, with no supervision or monitoring, in direct violation of BOP policies and protocols. It is extraordinary and inexplicable that Officer Jefferson could take the liberty to use Ms. Doe's cell to rape her, when she was under constant psychological observation for her recent suicide attempts. BOP personnel abjectly failed in their duties to take reasonable and necessary steps to protect Ms. Doe from violence.

103.     Defendant, through its agents, servants, contractors, and employees, violated its statutory duty to safeguard Ms. Doe and to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" pursuant to 18 U.S.C. § 4042. Instead, Ms. Doe became a victim of a senseless rape that was committed by Defendant United States' own employee, Officer Jefferson.

104.     It was only through Defendant United States, and its agents, servants, contractors, and/or employees' negligence, gross negligence, deliberate indifference, and/or carelessness in failing to take reasonable measures for the safety, care, and protection of Ms. Doe that she sustained catastrophic and permanent injuries alleged herein.

**AFTERMATH OF OFFICER JEFFERSON's RAPE**

105.     After seeing the shift change in the morning of July 6, 2024, Ms. Doe asked a female nurse doing rounds in the SHU if she could speak with the nurse's supervisor, as she wished to speak to medical staff rather than correctional staff. When the nurse wanted more information, Ms. Doe disclosed through the crack of her cell door that she had been raped by a correctional officer overnight. A Black male lieutenant then came to her cell with two female officers to speak with Ms. Doe. The lieutenant asked Ms. Doe where the other shift officer was when Officer

Jefferson raped her, presumably referring to Correctional Officer John Doe #1. This statement reflects the BOP staff's awareness that at least one other officer should have been monitoring Ms. Doe and failed to do so.

106. The lieutenant cuffed up Ms. Doe so that she could be transported. Same day, Ms. Doe was escorted by two BOP correctional officers to the Philadelphia Sexual Assault Response Center (hereinafter "PSARC"), an external rape center, where a rape kit was conducted and the clothes Ms. Doe was wearing during the rape was bagged for evidence. BOP officers who accompanied Ms. Doe to PSARC initially insisted on taking her clothes back with them, but a female worker at PSARC refused on the grounds that it was evidence of a crime.

107. Physical exam performed at PSARC confirmed that Ms. Doe had red indentations on arms and left shoulder, bruising under left collarbone, bruising on bilateral thighs, and red indentations all over bilateral buttocks. She had suffered injuries to her genitalia including irritation to her posterior fourchette (skin at the back of the vaginal opening), fossa navicularis (base of the vulva, between the vaginal opening and the posterior fourchette), bilateral vaginal wall, cervix, and perineum (area between the anus and the vulva). Blood was detected from her cervix as well, confirming the violence of the rape.

108. While at PSARC, Ms. Doe received a Ceftriaxone injection, oral antibiotics, and vaginal swab due to concern for sexually transmitted diseases. She also had to take a Plan B contraceptive pill and was put on 28 days of HIV post-exposure prophylaxis.

109. FDC Philadelphia staff failed to provide proper counseling or psychological treatment to Ms. Doe, despite PREA and BOP mandates to provide her with such services. *See* 28 C.F.R. § 115.83. When she returned to FDC Philadelphia later the same day on July 6, 2024, Ms. Doe was evaluated by BOP medical and/or psychology staff including Dr. Armenti. However, Dr.

Armenti negligently and improperly decided that a psychiatry referral was not warranted, despite the extreme traumatization that Ms. Doe had experienced due to the rape, in addition to the history of recent suicide attempts even prior to the rape. Instead of being provided with the treatment that she urgently needed, Ms. Doe was told that she would be transferred to a different BOP facility in the coming days anyway.

110.     Ms. Doe pleaded with the BOP officers that she did not want to be placed back in a dry cell. She was instead placed in the female SHU unit, where she was finally able to take a shower in her cell.

111.     Even though Ms. Doe's report against Officer Jefferson should not have been disclosed to his fellow correctional officers at FDC Philadelphia pursuant to binding PREA protocols and regulations, Ms. Doe soon learned that there was no such confidentiality. For example, while she was in the SHU, a male officer walked by with her food, looked at her, and said "no," and a female officer laughed. The male officer said, "you're not gonna PREA me," took her food around the corner, and made the female officer deliver it instead. Ms. Doe interpreted this comment by the male officer as a mocking reference to the report that she had made against Officer Jefferson. Ms. Doe felt mortified and degraded that her report was being treated as a joke by the BOP officers, and that she was being targeted for further harassment because of the report as she had feared.

112.     On or about July 8, 2024, while in a holding cell waiting to be transferred out of FDC Philadelphia to FTC Oklahoma City, Ms. Doe heard other women who had been housed in the female SHU unit talk about a bald, tall, Black officer who would intentionally observe women's naked bodies through the doors in the SHU. Upon information and belief, one of the women housed in the SHU who went by "Tory" (or something similar) observed this officer asking

another woman housed in the cell next to Tory's to take off her clothes and masturbate herself while he watched.[4] This officer would always take up shifts on the SHU floor, and there were multiple women housed in the SHU who would engage in sexual acts upon this officer's demands. As a result, this officer carried a reputation as a "pervert" for his sexually abusive behavior, which was known to other officers as well as to incarcerated women.

113.    Based on the description by the other women, which only matched Officer Jefferson's among the SHU officers that Ms. Doe had seen, as well as the women using the last name that sounded like "Stevenson" or "Jefferson" or something similar, Ms. Doe infers that it was Defendant Officer Jefferson that the women were referring to.

114.    After spending a day or two at FTC Oklahoma City, Ms. Doe arrived at FCI Aliceville on or about July 10, 2024. Immediately after her arrival, Ms. Doe again gave a report of her rape by Officer Jefferson to a psychologist at FCI Aliceville, Jade Kinney, PhD. Ms. Doe described an overwhelming sense of anxiety from the rape itself as well as the investigative process associated with it. She also discussed having disruptions in her sleep related to flashbacks of her trauma. Ms. Doe was prescribed antidepressants for her severe and recurrent major depressive disorder. Ms. Doe expressed strong interest in trauma programming.

115.    Despite difficulties associated with reliving the trauma, especially while still in BOP custody, Ms. Doe participated in therapy sessions with psychology staff at FCI Aliceville including L. Pimental, PhD. During these sessions, Ms. Doe discussed persisting intrusive memories of Officer Jefferson's rape, sleep disturbances, hypervigilance, uncontrollable mood

---

[4] While Tory's full name is unknown, she was a slim woman with light brown skin, with short curly hair and was waiting to be transferred for a court hearing. The other woman she was speaking with was Hispanic with long hair and an accent, and was waiting to be transferred to FTC Oklahoma City like Ms. Doe.

swings, emotional dysregulation, negative self-perception, low self-esteem, social isolation, distrust of others including fear that another BOP employee may rape her again, anxiety, hopelessness, and concern that she may be tempted to depend on opiates to improve mood. She continued to struggle with bouts of suicidal ideation and thoughts of self-harm, including days-long periods where she felt unable to get out of bed, which she did not always express to the BOP staff out of fear that she may then be placed in a SHU cell like the one in which she was raped.

116.    After Dr. Pimental left FCI Aliceville sometime around late 2024, Ms. Doe experienced further difficulty in seeking mental health treatment from other providers, because she did not have the same level of trust and comfort that she had begun to establish with Dr. Pimental. Ms. Doe still dedicated herself to practicing healthy coping mechanisms, completed several drug and alcohol treatment programs, and enrolled in the Non-Residential Drug Abuse Treatment Program while at FCI Aliceville.

117.    As of September 2024, Ms. Doe had not been given any updates from BOP staff regarding the status of the investigation into Officer Jefferson and retained the undersigned counsel. With assistance of counsel, Ms. Doe fully cooperated with criminal and administrative investigations into Officer Jefferson's rape. For example, on or about November 20, 2024, while at FCI Aliceville, Ms. Doe met with the DOJ investigators and an Assistant United States Attorney to give a detailed statement about the rape.

118.    On or about April 29, 2025, Officer Jefferson was indicted for the rape of Ms. Doe. *See* 2:25-cr-00182 (JDW) (E.D. Pa). Officer Jefferson was indicted on the counts of: aggravated sexual abuse in violation of 18 U.S.C. § 2241(a); sexual abuse in violation of 18 U.S.C. § 2242(3); sexual abuse of a ward in violation of 18 U.S.C. § 2243(b); and deprivation of rights under color of law under 18 U.S.C. §§ 242 and 250(b)(1).

119.    In June 2025, Ms. Doe's Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) was granted, based on Officer Jefferson's rape. *See* 2:18-cr-00271 (MJH) (W.D. Pa).

120.    Despite the progress in criminal investigation and her release from BOP custody, to this day, Ms. Doe continues to suffer the costs of her victimization at Officer Jefferson's hands. Plaintiff has suffered, and will continue to suffer from, major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, among other injuries, losses, harm, and damages that are expected to be permanent. Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

121.    Upon information and belief, Plaintiff will require sustained, long-term intensive medical, rehabilitative, psychiatric and/or psychological treatment with appropriate qualified providers. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. In that she had also suffered sexual victimization prior to incarceration, Plaintiff's

psychological trauma and the resulting impairment were acutely and severely exacerbated because of Officer Jefferson's rape.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT**
**(Against Defendant United States)**

122.    Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

*United States' liability for the acts and omissions of its employees*

123.    At all relevant times, Defendant United States hired and/or contracted various supervisory, administrative, correctional, unit, security, and/or medical staff at FDC Philadelphia, including Correctional Officer John Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors whose identity is currently unknown to the Plaintiff. Within the scope of their employment, these individuals were tasked to, undertook and endeavored to, and did provide custodial care, control, and supervision to people incarcerated at FDC Philadelphia, including but not limited to the Plaintiff Ms. Doe.

124.    At all relevant times, supervisory, administrative, correctional, unit, security, and/or medical staff at FDC Philadelphia held each of themselves out to persons incarcerated at FDC Philadelphia, and in particular to Plaintiff, as being equipped with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

125.     At all relevant times, FDC Philadelphia staff, within the scope of their employment with the United States, owed a non-delegable duty of care to Plaintiff while she was housed at FDC Philadelphia.

126.     At all relevant times, FDC Philadelphia staff, within the scope of their employment with the United States, had a duty to provide heightened and increased custodial care, control, and supervision to incarcerated people at FDC Philadelphia who were on psychological observation, including Ms. Doe.

127.     At all relevant times, FDC Philadelphia staff, within the scope of their employment with the United States, owed a heightened duty of care to Ms. Doe while she was housed in a dry cell in the SHU at FDC Philadelphia under suicide watch and/or psychological observation.

128.     It was the duty of supervisory, administrative, correctional, unit, security, and/or medical staff at FDC Philadelphia, including Officer Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors, as federal employees, while acting within the scope of their office or employment, to ensure that correctional personnel were not allowed to harm, injure, attack, assault, or rape incarcerated people.

129.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custody, including Ms. Doe.

130.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to maintain, operate, and control FDC Philadelphia as a safe and secure space for people in it, including but not limited to Plaintiff.

131.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to provide adequate custody, care, control, supervision, and monitoring to people at FDC Philadelphia, including but not limited to Plaintiff.

132.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiff from foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Jefferson.

133.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Jefferson's suspicious prior conduct; his violation of the operating protocols and/or rules including entering a woman's prison cell during sleeping hours; and his and his fellow SHU officers' utter failure to check on Ms. Doe at least every 30 minutes, as was required based on her psychological observation status.

134.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly, and that any suspicion or observation of sexually abusive conduct by a fellow officer would be immediately stopped, investigated, and reported.

135.     It was the duty of these FDC Philadelphia staff as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FDC Philadelphia, such that sexual assault described herein would not occur under their watch.

136.    The supervisory, administrative, correctional, unit, security, and/or medical staff at FDC Philadelphia, including Officer Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiff Ms. Doe by, *inter alia*, failing to take adequate steps to protect Ms. Doe from Officer Jefferson, despite the obvious risks that Officer Jefferson posed to Ms. Doe. To the extent that any other BOP staff members at FDC Philadelphia were aware of, or saw, Officer Jefferson's sexually abusive conduct and turned a blind eye to it, they also breached the duties owed to the Plaintiff by failing to take adequate steps to protect her from Officer Jefferson promptly.

137.    That breach directly exposed Plaintiff to an unreasonable risk of bodily injury, caused her to fear for their life and safety, and resulted in her being raped, causing her serious and permanent injuries.

138.    FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, knew or should have known that Ms. Doe was at a risk of serious bodily injury without constant observation and monitoring.

139.    FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, knew or should have known that Officer Jefferson was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FDC Philadelphia.

140.    FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, knew or should have known that Officer Jefferson had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and

demanding sexual favors from women inside SHU cells, and/or prior reports or allegations made against Officer Jefferson, and/or his conduct of unlocking and entering Ms. Doe's cell.

141.    FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Jefferson. They observed or should have observed that Officer Jefferson approached, unlocked, and entered Ms. Doe's cell against BOP policies and protocols, such that they knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent the rape, and yet they did not do so.

142.    FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, observed or should have observed through the glass window of Ms. Doe's dry cell, with the light on, that Officer Jefferson was attacking, assaulting, battering, and raping her, and yet disregarded or ignored Officer Jefferson's conduct.

143.    Despite actual and constructive notice of Officer Jefferson's abuse and/or threat to Ms. Doe's safety, FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, failed to take reasonable measures to provide Ms. Doe with a reasonably safe environment, and instead allowed Officer Jefferson to brutally rape Ms. Doe without any restraints or supervision.

144.    Despite actual and constructive notice of Officer Jefferson's abuse and/or threat to Ms. Doe's safety, FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, did not take reasonable, available measures to abate the risk of sexual abuse and/or grievous bodily injury to Ms. Doe, and to ensure her safety, in violation of federal regulations and BOP protocols.

145.    Despite actual and constructive notice of Officer Jefferson's abuse and/or threat to Ms. Doe's safety, FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, assisted in creating and increasing the danger to Ms. Doe by enabling, permitting, condoning, tolerating, and failing to prevent or stop Officer Jefferson's recurrent sexual abuse. They enabled and acquiesced in Officer Jefferson's conduct, thereby exposing and placing Ms. Doe directly in the way of harm.

146.    Despite actual and constructive notice of Officer Jefferson's abuse and/or threat to Ms. Doe's safety, FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, failed to adequately monitor, supervise, investigate, or discipline Officer Jefferson, allowing him to operate within FDC Philadelphia with impunity, and allowing him to seriously injure and rape Ms. Doe.

147.    Despite actual and constructive notice of Officer Jefferson's abuse and/or threat to Ms. Doe's safety, FDC Philadelphia staff, as federal employees and while acting within the scope of their employment, failed to immediately come to Ms. Doe's aid, or to provide her with needed care or treatment, once the rape occurred or began to occur.

148.    In each of the foregoing ways, the supervisory, administrative, correctional, unit, security, and/or medical staff at FDC Philadelphia, including Officer Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors, did not possess the necessary skill to maintain a safe and secure environment and to protect Plaintiff from foreseeable harm.

149.    In each of the foregoing ways, FDC Philadelphia staff neglected to apply the skill they did have.

150.     In each of the foregoing ways, FDC Philadelphia staff did not use reasonable care in applying the skill they had.

151.     FDC Philadelphia staff mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff is not yet aware.

152.     Under the FTCA, Defendant United States is the sole proper defendant for each breach of duty by federal employees alleged in foregoing paragraphs. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

153.     Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, and negligence of United States' agents, servants, contractors, and/or employees, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

154.     FDC Philadelphia staff's conduct herein was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiff.

155.     FDC Philadelphia staff were aware of facts that gave rise to an unreasonable risk that Plaintiff would be irreparably injured.

156.     It was foreseeable to the FDC Philadelphia staff, based on the facts known to them, that Plaintiff was at a risk of imminent serious harm including sexual abuse and rape.

157.     Yet, FDC Philadelphia staff in their official capacities failed and/or refused to prevent the abuse of Plaintiff or to prevent its psychological and physical consequences from worsening to the extent that they did.

158. FDC Philadelphia staff knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

159. The failure of FDC Philadelphia staff, including Officer Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors, to prevent, investigate, or acknowledge Officer Jefferson's sexual abuse of prisoners, including Plaintiff, and to protect Plaintiff from substantial and foreseeable risk of sexual abuse, served no legitimate policy purpose. On the contrary, FDC Philadelphia staff were required by mandatory BOP policies and federal regulations to immediately report, intervene, and investigate when they learned of suspicion or indication of staff-on-inmate sexual abuse. The failure to do so by FDC Philadelphia staff was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

160. Defendant United States also had an independent duty owed to the Plaintiff to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

161. Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility, to safeguard its prisoners from its own employees, and to provide psychological care and treatment to these victims.

162. Defendant United States failed to provide reasonably safe environment to Plaintiff, who was under its care, custody, and control without ability to escape.

163. Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R.

§ 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

164. Despite actual and constructive notice of Officer Jefferson's abuse, Defendant United States acted negligently in improperly hiring, training, retaining, supervising, and/or disciplining Officer Jefferson.

165. Despite actual and constructive notice of Officer Jefferson's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Jefferson, allowing him to operate with impunity, and allowing him to seriously injure and rape Ms. Doe.

166. Defendant United States acted negligently in hiring Officer Doe #1, other officers assigned to the dry cell area and/or the SHU floor, control room officers, as well as Officer Jefferson's other colleagues and/or supervisors, who did not possess the necessary skill to maintain safe and secure environment and to protect Plaintiff from foreseeable harm.

167. Even though the United States' hiring, retention, demotion, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of

its employees' tortious conduct, yet ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

168.     United States' acts and omissions as described in the foregoing paragraphs proximately caused Plaintiff's injuries.

*Summary*

169.     The above-described acts and omissions of FDC Philadelphia staff and/or the United States constitute the tort of negligence under the laws of the State of Pennsylvania.

170.     Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Doe in accordance with the laws of Pennsylvania, for the negligence upon Ms. Doe.

171.     Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of Plaintiff.

172.     As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

173. As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM
### UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

174. Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

175. Defendant United States, individually or through FDC Philadelphia staff in their official roles and capacities as agents, servants, contractors, and/or employees of the United States, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiff.

176. The acts and omissions of the FDC Philadelphia staff described herein constituted extreme and outrageous conduct, which caused Plaintiff's debilitating emotional harm, trauma, distress, pain, and severe physical and mental injuries.

177. Ms. Doe's violent rape qualifies as a physical impact that caused her debilitating emotional harm, trauma, distress, pain, and severe physical and mental injuries.

178. The above-described acts and omissions of FDC Philadelphia staff and/or the United States constitute the tort of negligent infliction of emotional distress under the laws of the State of Pennsylvania.

179.     Under the FTCA, Defendant United States is liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

180.     Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Doe in accordance with the laws of Pennsylvania, for the negligent infliction of emotional distress upon Ms. Doe.

181.     As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

182.     As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## THIRD CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
## UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

183.    Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

184.    The acts and omissions of Officer Jefferson meet the elements necessary to establish a claim for intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) that is intentional or reckless; (3) and directly caused emotional distress; (4) which was severe. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979). The conduct must be so egregious that it goes beyond the bounds of decency and is intolerable in a civilized community.

185.    Officer Jefferson engaged in extreme and outrageous conduct by subjecting Plaintiff to violent sexual acts while she was incarcerated in his custody. He abused his authority and power to violate her in a manner that is shocking, atrocious, despicable, and intolerable beyond all bounds of decency.

186.    Officer Jefferson had an intention to cause, or recklessly disregarded the probability of causing, severe emotional distress, trauma, pain, and physical and mental injuries to Plaintiff.

187.    Officer Jefferson's rape occurred under coercive circumstances, and by intentionally subjecting Plaintiff to these acts, Officer Jefferson acted maliciously in a manner that is deeply offensive to human dignity and void of penological justification.

188.    Plaintiff in fact suffered debilitating emotional harm, trauma, distress, pain, and severe physical and mental injuries. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

189.     The above-described acts and omissions of Officer Jefferson constitute the tort of intentional infliction of emotional distress under the laws of the State of Pennsylvania.

190.     Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, sexual battery, and sexual assault) perpetrated by Officer Jefferson. Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents, including correctional officers and other law enforcement officers, which occurred within the scope of their employment or under color of federal law as here.

191.     At all relevant times, Officer Jefferson was acting under color of authority as a "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h). At all relevant times, Officer Jefferson supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiff within the scope and course of his employment with Defendant United States.

192.     Officer Jefferson's employment at FDC Philadelphia was essential to his commission of tortious misconduct, which could not have occurred absent his federal employment and related privileges.

193.     At all relevant times, Officer Jefferson used his authority as a law enforcement officer to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiff and to attempt to prevent her from disclosing the sexual assault for fear of retaliation, victim-blaming or shaming, additional assaults, and continued SHU placement, among others.

194.    At all relevant times, Officer Jefferson used his authority as a law enforcement officer to rape the Plaintiff, knowing that she had no ability to consent or to withhold consent as a prisoner.

195.    Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Doe in accordance with the laws of Pennsylvania, for the intentional infliction of emotional distress that Officer Jefferson committed on Ms. Doe.

196.    As a result of Officer Jefferson's use and abuse of his position of authority as a "law enforcement officer" within the course and scope of their employment, Defendant United States is vicariously liable, and has waived its sovereign immunity, for the intentional torts committed upon the Plaintiff. Therefore, Plaintiff bring this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officer, Michael Jefferson.

197.    As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

198.    As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF

### BATTERY CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

199.    Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

200.    Plaintiff brings this Claim under the FTCA based on the conduct of Officer Jefferson, which constitutes the tort of battery or sexual battery under the laws of the State of Pennsylvania.

201.    Officer Jefferson committed battery on Ms. Doe without her consent.

202.    Officer Jefferson physically forced Ms. Doe into sexual submission through threat and violence. Ms. Doe reasonably believed that Officer Jefferson had the present ability to execute the threat.

203.    Officer Jefferson physically forced Ms. Doe into sexual submission by threatening her, by words and/or by implication, that she would suffer retaliation if she did not stay silent during and after the rape, and she reasonably believed that as a correctional officer, he had the ability to execute the threat in the future while she was in the custody of FDC Philadelphia.

204.    In addition, Ms. Doe reasonably believed that Officer Jefferson was in a position of control or authority, and that she did not have the ability to consent or withhold consent to sexual acts with him.

205.     Plaintiff was incapable of consenting. 18 U.S.C. § 2243(b) makes it a felony for a BOP employee to "knowingly engage in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging." Consent is not a defense to this crime, considering the inherently unequal power dynamic between BOP employees and prisoners. As the OIG explained in a 2005 report regarding prison staff sexual abuse, prisoners are precluded from having the same ability as staff members to consent to sex. Simply put, there is no scenario under which an incarcerated person can give consent to sexual contact, harassment, or abuse by BOP personnel.

206.     Without Ms. Doe's consent, Officer Jefferson intentionally and repeatedly penetrated her vagina with his penis and attempted to penetrate her anus with his penis, by force. Officer Jefferson thereby caused Ms. Doe to suffer harmful and offensive sexual contact with him, with the intent of causing such harmful and offensive contact. Officer Jefferson's contact with Ms. Doe was deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

207.     The above-described acts and omissions of Officer Jefferson constitute the tort of battery under the laws of the State of Pennsylvania.

208.     At all relevant times, Officer Jefferson used his authority as a law enforcement officer to batter the Plaintiff, knowing that she had no ability to consent or to withhold consent as a prisoner.

209.     Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Doe in accordance with the laws of Pennsylvania, for the battery that Officer Jefferson committed on Ms. Doe.

210.     As a result of Officer Jefferson's use and abuse of his position of authority as a "law enforcement officer" within the course and scope of their employment, Defendant United

States is vicariously liable, and has waived its sovereign immunity, for the intentional torts committed upon the Plaintiff. Therefore, Plaintiff bring this Claim for battery under the FTCA against the United States, based on the conduct of its officer, Michael Jefferson.

211.    As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

212.    As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF

### ASSAULT CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

213.    Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

214.     Plaintiff brings this Claim under the FTCA based on the conduct of Officer Jefferson, which constitutes the tort of assault or sexual assault under the laws of the State of Pennsylvania.

215.     Officer Jefferson intentionally threatened Ms. Doe to physically harm her, with an apparent ability to do so as a correctional officer. The threats occurred by word and act, with Officer Jefferson verbally threatening Ms. Doe as well as physically forcing her into sexual submission.

216.     Officer Jefferson intentionally caused an imminent and reasonable apprehension of physically harmful contact, creating a well-founded and reasonable fear in Ms. Doe that violence was imminent. He acted with the intent of causing harmful and offensive contact with Ms. Doe, including sexually offensive contact as described above.

217.     Ms. Doe reasonably believed that Officer Jefferson would make imminent harmful and offensive sexual contact with her.

218.     The above-described acts and omissions of Officer Jefferson constitute the tort of assault under the laws of the State of Pennsylvania.

219.     At all relevant times, Officer Jefferson used his authority as a law enforcement officer to assault the Plaintiff, knowing that she had no ability to consent or to withhold consent as a prisoner.

220.     Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Doe in accordance with the laws of Pennsylvania, for the assault that Officer Jefferson committed on Ms. Doe.

221.     As a result of Officer Jefferson's use and abuse of his position of authority as a "law enforcement officer" within the course and scope of their employment, Defendant United

States is vicariously liable, and has waived its sovereign immunity, for the intentional torts committed upon the Plaintiff. Therefore, Plaintiff bring this Claim for assault under the FTCA against the United States, based on the conduct of its officer, Michael Jefferson.

222.     As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

223.     As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SIXTH CLAIM FOR RELIEF

### BATTERY CLAIM UNDER STATE LAW
### (Against Defendant Michael Jefferson)

224.     Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

225. Plaintiff brings this Claim against Officer Jefferson individually under state law based on his conduct, which constitutes the tort of battery or sexual battery under the laws of the State of Pennsylvania.

226. Officer Jefferson physically forced Ms. Doe into sexual submission through threat and violence. Ms. Doe reasonably believed that Officer Jefferson had the present ability to execute the threat.

227. Officer Jefferson physically forced Ms. Doe into sexual submission by threatening her, by words and/or by implication, that she would suffer retaliation if she did not stay silent during and after the rape, and she reasonably believed that as a correctional officer, he had the ability to execute the threat in the future while she was in the custody of FDC Philadelphia.

228. In addition, Ms. Doe reasonably believed that Officer Jefferson was in a position of control or authority, and that she did not have the ability to consent or withhold consent to sexual acts with him.

229. Without Ms. Doe's consent, Officer Jefferson intentionally and repeatedly penetrated her vagina with his penis and attempted to penetrate her anus with his penis, by force. Officer Jefferson thereby caused Ms. Doe to suffer harmful and offensive sexual contact with him, with the intent of causing such harmful and offensive contact. Officer Jefferson's contact with Ms. Doe was deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

230. As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such

as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

231.　　As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF

### ASSAULT CLAIM UNDER STATE LAW
### (Against Defendant Michael Jefferson)

232.　　Plaintiff hereby repeats, reiterates, and incorporates each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

233.　　Plaintiff brings this Claim against Officer Jefferson individually under state law based on his conduct, which constitutes the tort of assault or sexual assault under the laws of the State of Pennsylvania.

234.　　Officer Jefferson intentionally threatened Ms. Doe to physically harm her, with an apparent ability to do so as a correctional officer. The threats occurred by word and act, with Officer Jefferson verbally threatening Ms. Doe as well as physically forcing her into sexual submission.

235.    Officer Jefferson intentionally caused an imminent and reasonable apprehension of physically harmful contact, creating a well-founded and reasonable fear in Ms. Doe that violence was imminent. He acted with the intent of causing harmful and offensive contact with Ms. Doe, including sexually offensive contact as described above.

236.    Ms. Doe reasonably believed that Officer Jefferson would make imminent harmful and offensive sexual contact with her.

237.    As a direct and proximate result of the foregoing, Plaintiff Ms. Doe suffered major depressive disorder; PTSD; complex PTSD; anxiety; hopelessness; suicidal ideation; debilitating psychological trauma; permanent and catastrophic psychological injuries; mental anguish; severe emotional distress; physical ailments or injuries associated with psychological injuries; physical injuries including repeat infections and/or abscesses in the pubic area, somatic symptoms as such as recurrent abdominal pain, and injuries to her body and genitalia from the rape; pain and suffering; humiliation; embarrassment; frustration; loss of enjoyment and pleasures of life; loss of quality of life; offenses to her personal dignity; limitations with activities of daily living; past and future economic losses; past and future medical costs and hospital expenses; past and future loss of income and earning capacity; and past and future reputational harm, as well as attendant damages, both general and special.

238.    As a direct and proximate result of the foregoing, Ms. Doe has suffered and will continue to suffer serious injuries, losses, harm, and damages, including without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jane Doe respectfully requests that judgment be entered against Defendants, and that this Court grant the following to the Plaintiff:

1.      An award of compensatory and/or punitive damages for all injuries caused by the Defendants, including personal, physical, and psychological injuries, past and future pain and suffering, emotional distress, humiliation, loss of enjoyment of life, loss of quality of life, mental, financial, economic, and reputational damages, both past and future, general and special, and other losses, harm, and damages, both general and special, in an amount to be determined at trial;

2.      An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.      An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.      An award of attorneys' fees to the fullest extent permitted by law; together with

5.      Such other and further relief at law or in equity as this Honorable Court may deem just and proper.

Dated: November 23, 2025

<table>
<tr>
<td>

S/ *Emma Klein*
**EMMA KLEIN**
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
Pennsylvania Bar No. 337384
Tel: (212) 869-3500 Ext. 234
e.klein@fuchsberg.com
*Attorney for Plaintiff*

</td>
<td>

S/ *Jaehyun Oh*
**JAEHYUN OH***
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
*Attorney for Plaintiff*
(* Motion for *Pro Hac Vice* admission
to be submitted forthwith)

</td>
</tr>
</table>